E-FILED 

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| JACK STEVENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:12-cv-01419-SLD-TSH |
| | ) | |
| ILLINOIS DEPARTMENT OF CORRECTIONS, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>ORDER</u>

Plaintiff Jack Stevens is suing his employer, the Illinois Department of Corrections ("IDOC"), for discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213. Stevens, a Correctional Officer, alleges that he was fired because of a depressive episode he suffered in February 2005. Before the Court are Defendant's Motion for Summary Judgment, ECF No. 23, and Plaintiff's Motion for Summary Judgment, ECF No. 28. For the following reasons, both motions are DENIED.

**BACKGROUND[1]**

**I.      Factual Background**

Stevens has a history of depressive episodes. He was hospitalized for a bout of major depression in 2000. In March 2001, the IDOC hired him to work as a correctional officer at the Stateville Correctional Center. At the time he was hired, Stevens disclosed his earlier

---

[1] Except where otherwise noted, the details recited here are taken from the parties' statements of undisputed material facts.

hospitalization to the IDOC, as well as the name of his treating psychiatrist.  He also indicated

that he did not have a mental condition that would limit the kind of work he could perform.

The IDOC's class specification for correctional officers states that they are required to:

> [P]erform[] security and custodial duties in a correction center supervising the
> movements, conduct, work, discipline, recreation, and training of residents;
> control[] residents from stations in cell houses, yards, towers, dormitories, dining
> halls, or on work details; enforce[] rules of conduct, security, and work standards
> by verbal admonishments for minor deviations or by making written reports of
> significant violations to superiors; [and] enforce[] and maintain[] disciplinary,
> safety, sanitary, security and custodial measures.

Ill. Dep't of Cent. Mgmt. Servs. Class Specification 1, Mem. Supp. Def.'s Mot. Summ. J. Ex. N-

3, ECF No. 24-4.  Some examples of the tasks correctional officers are required to perform are

escorting prisoners to work assignments, acting as a "turnkey," and standing guard with a gun in

a tower.  *Id.*  In a section labeled "desirable requirements," the class specification states that the

job "[r]equires ability to properly use firearms."  *Id.* at 2.

It is unlawful in Illinois (and has been at all times relevant to this lawsuit) for a person to

possess firearms or firearm ammunition when "[h]e has been a patient in a mental institution

within the past 5 years."  720 ILCS 5/24-3.1(a)(4).  The Illinois State Police ("ISP") can waive

this ban by issuing a Firearm Owner's Identification ("FOID") Card, pursuant to 430 ILCS

65/0.01–65/16-3.  The Illinois Administrative Code requires that Illinois state employees obey all

federal state and local laws.  20 Ill. Admin. Code 2, Mem. Supp. Def.'s Mot. Summ. J. Ex. A-2,

ECF No. 24-1.  However, the IDOC did not require Stevens to obtain a waiver from the ISP or a

FOID Card at the time he was hired, or anytime thereafter until the dispute that elicited this

lawsuit.

In the years after he was hired, Stevens worked for the IDOC without incident, meeting

and sometimes exceeding expectations.  In February 2004, he was transferred to Pontiac

Correctional Center ("Pontiac").  Partly as a consequence of this move, he became depressed. He went to see a physician who prescribed him Wellbutrin and Zoloft, but the drugs did not stop him from sliding deeper into depression.  Bohlen Report 2, Mem. Supp. Def.'s Mot Summ. J. Ex. F, ECF No. 24-3.

On January 27, 2005, Stevens sent two handwritten memoranda to Assistant Warden Blair Leibach.  The memoranda described Stevens's move to Pontiac as having had "a dramatic effect on my life."  Jan. 27, 2005 Stevens Letter 1, Mem. Supp. Def.'s Mot. Summ. J. Ex. D, ECF No. 24-3.  Stevens wrote that because of the shift he was being required to work for the first year of his employment at Pontiac, he had been unable to spend enough time with his wife, and a "spiral downward began in August 2004."  *Id.* at 4.  Stevens stated that he was "struggling worse than ever," *id.*, and that it was a "tremendous struggle for me just to get out of bed and come to work and function."  *Id.* at 5.  He also stated that the shift he was working was "about to kill me, literally," and that it was "difficult deciding whether or not [he] want[ed] to live for another day."  *Id.*  He closed the first memorandum by telling Leibach that "the ball [was] in [Leibach's] court."  *Id.*  The second memorandum documented what Stevens regarded as sexual harassment he was suffering at the hands of a transgender IDOC employee, Joni Harris, which Stevens also cited as contributing to his depression.  *Id.* at 2.

In response to these memoranda, Pontiac Warden Guy Pierce directed Stevens to visit the Chief Mental Health Officer for the Department of Corrections, Amy Ray.  Ray met with Stevens on February 2, 2005 and prepared a report on his mental condition.  Stevens told Ray that he had considered using his gun to shoot himself while on duty in the tower, that he was experiencing suicidal thoughts on a daily basis, and that he had considered overdosing on his current medication.  Ray Report 1, Mem. Supp. Def.'s Mot. Summ. J. Ex. E, ECF No. 24-3.  Ray

provisionally diagnosed Stevens with major depressive disorder and bipolar disorder, and determined that his current symptoms were "severe and acute." *Id.* at 3. She recommended that he be placed on paid administrative leave, and referred him to a psychiatrist for an independent evaluation of fitness for duty. *Id.* Because his symptoms were so severe, Ray also called Stevens's wife and asked her to take Stevens immediately to the Pavilion Emergency Evaluation Center ("Pavilion") in Champaign, Illinois. Stevens checked into Pavilion and remained there for three days. He was placed on paid administrative leave or "administrative lockout." He was not told that his employment would be jeopardized by following Ray's directions and going to Pavilion.

On February 3, 2005, Stevens received a letter from the IDOC telling him that the IDOC had arranged for him to be evaluated by Dr. Joseph Bohlen on March 23, 2005. The IDOC told Stevens that he would not be able to return to work until after the evaluation had been performed. Bohlen performed the evaluation as planned, and determined that Stevens would be able to return to work without restriction in one month, to allow time for newly-prescribed medication to take effect. Bohlen Report 4, Mem. Supp. Pl.'s Mot. Summ. J. Ex. 4, ECF No. 28-2. Bohlen further opined that Stevens would need to remain on medication for the remainder of his career or life, because it was his lack of appropriate medication in 2004 and early 2005 that had precipitated his decline. *Id.* After receiving Bohlen's report, the IDOC instructed Stevens to return to work on April 20, 2005.

On April 18, 2005, Stevens sent a letter to the IDOC requesting reasonable accommodation under the ADA for depression and bipolar disorder. Specifically, Stevens asked to be moved to a day shift assignment, to be moved out of the North Segregation Unit and South Mental Health Unit, to be transferred from Pontiac to the IDOC's Lincoln-Logan facility, and to

be reassigned as a correctional counselor.  Apr. 18, 2005 Steven Letter 3, Mem. Supp. Def.'s

Mot. Summ. J. Ex. G, ECF No. 24-3.  He stated that "[t]he stress of returning to Pontiac may

hamper my recovery or even increase the likelihood of a serious relapse."  *Id.* at 2.  Stevens also

mentioned that he felt he had been placed in a "hostile work environment" by the perceived

sexual advances of Harris, and suggested that he might seek redress with the Illinois Department

of Human Rights ("IDHR").  *Id.*

The next day, April 19, 2005, Stevens received a call from a human resources

representative at Pontiac, who told him that he should not return to work because he was back on

administrative lockout.  On April 21, 2005, Stevens filed a charge of discrimination with the

IDHR.  On April 25, 2005, IDOC Director Roger Walker sent a memorandum to all IDOC

employees entitled "Legal Impediment to Possessing a Firearm Due to Inpatient Status in Mental

Hospital."  Walker Memo 1, Mem. Supp. Def.'s Mot. Summ. J. Ex. I, ECF No. 24-3.  The

memorandum cited the prohibition of 720 ILCS 5/24-3.1 on firearm possession by those who

have been patients in mental hospitals within the last five years and stated that the IDOC "shall

not" keep such employees in positions where use of a firearm is "an essential function of the

job," naming as one such position the job of correctional officer.  *Id.*  The memorandum also

stated that if the IDOC discovered that someone had been a patient at a mental hospital, he would

be referred for an employee review hearing.  *Id.*  This letter was not sent to Stevens; rather, his

brother, also an IDOC employee, received it and showed it to him.  Stevens Decl. ¶ 20, ECF No.

28-1.  Stevens claims that he did not at the time believe that the memorandum applied to him,

thinking that it applied only prospectively.

On June 20, 2005, Stevens was referred for an employee review hearing.  A hearing was

held on June 30, 2005, and on July 1, 2005, the Hearing Officer recommended that Stevens be

placed on suspension for 30 days, pending discharge, because he could not legally carry a firearm.  Having learned that the IDOC's policy against employing people who could not carry forearms because of a hospitalization applied to him as well, Stevens applied to the ISP on July 12, 2005, for a waiver via issuance of an FOID Card.  On July 29, 2005, Stevens was formally suspended pending discharge, at which point his paid period of administrative lockout ended.  On August 9, 2005, Stevens applied again to the IDOC for reasonable accommodation under the ADA, this time requesting a temporary restriction of his ability to use a firearm, and transfer to either a youth supervisor or correctional counselor position.  The IDOC denied this request, and terminated Stevens on August 25, 2005.

Stevens then filed a formal grievance.  The IDOC denied it.  Stevens' union and the IDOC met to discuss the grievance on October 5, 2005.  The IDOC denied the grievance again, but stated that had Stevens obtained a waiver from the ISP they would not object to his return.

On October 31, 2005, Stevens received a phone call from Rachel McKinzie, who worked at IDOC.  During the course of their conversation, McKinzie mentioned that the IDOC had received a waiver from the ISP.  Stevens had further conversations with the IDOC, and submitted a letter to them from Dr. Douglas Bey, which opined that Stevens was "capable of returning to work with no limitations or restrictions including the use of firearms in the line of duty."  On November 16, 2005, the ISP issued Stevens a FOID card.  *See* Nov. 16, 2005 ISP Letter, Mem. Supp. Pl.'s Mot. Summ. J. Ex. 15, ECF No. 28-3.  Stevens promptly presented the waiver to the IDOC; the IDOC, however, did not reinstate Stevens.

During this time, Stevens appealed the initial denial of his grievance.  Hunter's union representative, Ron Pitts, after discussions with the IDOC, told Stevens that he would be re-hired if he submitted to an additional psychiatric evaluation, dropped his ADA request for reasonable

accommodation, and dropped his IDHR claim.  Stevens did not drop his claim.  In May 2006, the

grievance came before a neutral arbitrator, who sustained it, ordering the IDOC to reinstate

Stevens and award him back pay from November 16, 2005 (the date that he received his FOID

card) onward.  Stevens claims that IDOC continued to resist his reinstatement by not authorizing

him to return to work until August 15, 2006.

## II.      Procedural History

Stevens thereafter pursued two separate claims before the IDHR, one based on sexual

harassment charges surrounding the behavior of Harris, and the other based on alleged disability

discrimination against Stevens under the Illinois Human Rights Act.  The former matter was

dismissed by the IDHR on June 29, 2012.  Stevens elected not to pursue the remaining

discrimination claim before the IDHR, instead seeking a right to sue letter from the EEOC,

receiving the letter,[2] and filing the instant federal lawsuit on October 13, 2012.

In the instant suit, Stevens seeks relief under the ADA on the theory that he was

discriminated against by the IDOC because of his disability, and that he was retaliated against

because he pursued his rights under the ADA.  He seeks a declaratory judgment to this effect,

economic damages suffered from June 29, 2005 to November 16, 2005, pain and suffering, and

attorney's fees.  Compl. ¶ 41.  His claims survived a motion to dismiss, Aug. 3, 2015 Order, ECF

No. 15, and now both sides move for summary judgment.

## DISCUSSION

## I.      Legal Standard on a Motion for Summary Judgment

---

[2] Stevens claimed he sought and received the letter, Resp. Mot. Dismiss 9, ECF No. 7, although the Court cannot discover it in the docket.  However, since the IDOC never raised the issue, it is waived in any case and no bar to jurisdiction here.  *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) ("We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.").

Summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal quotation marks omitted).  A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997).  The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255).

The movant in a summary judgment motion bears the initial burden of production— pointing the court to the materials in the record that "demonstrate the absence of a genuine issue of material fact" for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the nonmovant bears the ultimate burden of persuasion on a particular issue, however, the requirements on the movant are "not onerous" and "may be discharged by showing—that is, point[ing] out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (internal quotation marks omitted).  Once the movant discharges her burden, the burden shifts to the nonmovant to "make a showing sufficient to establish the existence of an element essential to

8

that party's case." *Celotex*, 477 U.S. at 322. To satisfy this burden, a nonmovant must "go

beyond the pleadings . . . to demonstrate that there is evidence upon which a jury could properly

proceed to find a verdict in her favor." *Modrowski*, 712 F.3d at 1169 (internal quotation marks

omitted). "A plaintiff may not defeat the defendant's properly supported motion for summary

judgment without offering any significant probative evidence tending to support the complaint."

*Tri-Gen Inc. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 433 F.3d 1024, 1038

(7th Cir. 2006) (internal quotation marks omitted).

## II.    ADA Discrimination and Retaliation Claims

The ADA, as it read at the times relevant to this case,[3] provided that "[n]o covered entity

shall discriminate against a qualified individual with a disability because of the disability of such

individual in regard to job application procedures, the hiring, advancement, or discharge of

employees, employee compensation, job training, and other terms, conditions, and privileges of

employment." 42 U.S.C. § 12112(a) (2008) (amended January 1, 2009). The term "covered

entity" means "an employer, employment agency, labor organization, or joint labor-management

committee." *Id.* § 12111(2). A "qualified individual with a disability" is "an individual with a

disability who, with or without reasonable accommodation, can perform the essential functions

of the employment position that such individual holds or desires." *Id.* § 12111(8).

A "disability" is defined by the statute as either "(A) a physical or mental impairment that

substantially limits one or more of the major life activities of such individual; (B) a record of

such impairment; or (C) being regarded as having such an impairment." *Id.* §§ 12102(A)–(C).

---

[3] The ADA Amendments Act of 2008 (ADAAA) substantially changed the ADA, broadening the scope of the law's coverage and rejecting the holdings of the Supreme Court in *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, (2002). *See Lytes v. DC Water & Sewer Auth.*, 572 F.3d 936, 939 (D.C. Cir. 2009). Because Congress did not intend the ADAA's changes to be retroactive, however, this Court will apply the language of the ADA as it stood prior to its amendment. *See Fredricksen v. United Parcel Serv.*, Co., 581 F.3d 516, 521 n.1 (7th Cir. 2009); *Gratzl v. Ofc. of Chief Judges of 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010).

9

Major life activities are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (2011) (amended May 24, 2011).[4] In order to show disability status, an individual must do more than submit evidence of a medical diagnosis; rather, he must demonstrate the disability in terms of the limitations it places on his own major life activities. *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 185, (2002), *overturned on other grounds by* U.S. Pub.L. 110-325 (2009) ("[T]he ADA requires [plaintiffs] to offer evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial."); *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1061 (7th Cir. 2000) (holding that to get past summary judgment, a plaintiff "must also demonstrate in the record that *her* depression substantially limits *her* ability to perform a major life activity").

In order to show discrimination under the ADA, a disabled plaintiff may use a direct or indirect method of proof of an employer's impermissible animus in taking an adverse employment action.[5] *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Under the direct method, the plaintiff may offer direct or circumstantial evidence of discrimination. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). Direct evidence is essentially an

---

[4] In *Toyota Motor*, the Supreme Court looked to EEOC regulations to interpret the ADA's use of the term "disability." *Toyota Motor*, 534 U.S. at 193. Similar although more expansive language defining "major life activities" was later incorporated into the ADA when Congress amended it. *See* 42 U.S.C. § 12102(2)(A). Because this Court is applying the unamended version of the ADA, it also turns to the EEOC regulations used for guidance by the *Toyota Motor* court before the passage of the ADAAA.

[5] It is evident, although Stevens does not say so, that he is not attempting to proceed with either his retaliation claim or his discrimination claim by a method of indirect proof, which would in each case require him to show that similarly situated employees who were not disabled were treated more favorably than he was. *See Lloyd*, 552 F.3d at 601. Stevens himself, in his deposition, occasionally and vaguely referred to other employees who, he thought, had not been fired after being treated for mental illness or for misbehavior with guns. Stevens Dep. 34–36, Mem. Supp. Def.'s Mot. Summ. J. Ex B, ECF No. 24-2. But Stevens does not now point, in his complaint or in his motion for summary judgment, to any employees situated similarly to himself, as he would have to do were he seeking to prove ADA violations under an indirect theory. Insofar as he may have wished to do so, he has failed to provide any evidence of a genuine issue of material fact via that method, and such a claim would fail at this stage. Therefore, the Court will not evaluate his claims under the indirect method of proof.

admission by the employer that its employment action rested on the prohibited animus.  *Id.* Circumstantial evidence sufficient to survive a motion for summary judgment is evidence that might allow a jury to infer intentional discrimination, and can include "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action."  *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011) (citing *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 586–87 (7th Cir. 2011)).

If relying on circumstantial evidence, to withstand summary judgment, a plaintiff must present a "convincing mosaic" of evidence from which a reasonable jury could infer retaliatory intent.  *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643–44 (7th Cir. 2013) (citations omitted). To be convincing, circumstantial evidence "must point directly to" a prohibited reason for the employer's action and must be "directly related to the employment decision."  *Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012) (internal citations and quotation marks omitted). A reasonable jury may not draw such an inference "based on one isolated 'bit' or 'piece'" of circumstantial evidence.  *Hobgood*, 731 F.3d at 644.  For example, suspicious timing on its own rarely suffices to show retaliation.  *Id*.  "The mere fact that one event preceded another does nothing to prove that the first event caused the second; the plaintiff also must put forth other evidence that reasonably suggests that her protected speech activities were related to her employer's discrimination."  *Lewis v. City of Chicago*, 496 F.3d 645, 655 (7th Cir. 2007) (internal quotation marks omitted).

The ADA also prohibits employers from retaliating against employees.  In other words, employers may not take adverse employment actions against employees for making a charge of employment discrimination, 42 U.S.C. §§ 12203(a), or exercising any right granted by the ADA, 42 U.S.C. §§ 12203(b).  The methods by which a plaintiff may prove retaliation are the same as those by which he may prove discrimination—directly, either by direct or circumstantial evidence, or indirectly.  *See Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 659 (7th Cir. 2013).  Under the direct method of proof, a plaintiff must show that "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) [there was] a causal connection between the two."  *Id.* (citing *Casna v. City of Loves Park*, 574 F.3d 420, 426 (7th Cir. 2009)).  This causal connection can, again, be shown by direct or circumstantial evidence.

### III.     The IDOC's Motion for Summary Judgment

The IDOC argues:  (1) that Stevens is not disabled under the ADA, Mem. Supp. Def.'s Mot. Summ. J. 11–15; (2) that the IDOC had a legitimate, non-pretextual reason for refusing to permit Stevens to return to work (namely, his firearm ban), which also disqualified him as a claimant under the ADA because no reasonable accommodation was possible, *id.* at 15–16; (3) that Stevens has pointed to no evidence suggesting that the IDOC demanded he dismiss his pending claims in the fall of 2005 in exchange for being re-hired, *id.* at 16–18; (4) that even if such evidence existed, it would not show retaliation, *id.* at 18–20; (5) that Stevens has pointed to no evidence suggesting that the IDOC's July 2005 firing was retaliatory, *id.* at 21; and (6) that any request the IDOC may have made that Stevens drop his lawsuit in exchange for re-hiring has not been shown to have been retaliatory, *id.* at 21–25.[6]

---

[6] The parties have chosen not to proceed with the procedure for filing summary judgment motions laid out in Local Rule 7.1(D), specifying a motion, response, and reply, with motions for summary judgment fileable by either party. Defendant filed its motion for summary judgment, and Plaintiff filed his own, which occasionally responds to

Although the IDOC's motion is broken into several sub-parts, listed above, it essentially attacks two elements of Stevens's ADA retaliation and discrimination claims:  (1) whether Stevens was a "qualified individual with a disability" under the ADA; (2) and whether there was a causal link between the IDOC's awareness of his disability and/or his protected activities under the ADA, and his later firing. [7]  If Stevens was not a qualified individual with a disability, he cannot make out a claim of discrimination, although his retaliation claim could still survive, resting as it does purely on the theory that he was retaliated against for having brought or threatened to bring ADA claims, not whether those claims are, finally, meritorious.  *See Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir.2007).  If either his discrimination claim or his retaliation claim are not supported by a causal link, the claim fails.  Because the facts associated with Stevens's disability are closely intertwined with the facts surrounding his assertions of ADA rights, the Court considers them together below.

**A.  "Qualifying Individual" Status Under the ADA**

To be a qualifying individual under the ADA, one must have a "disability," which means having an actual impairment as defined by the ADA, having a record of such an impairment, or simply having been regarded by one's employer as having such an impairment, whether or not one was actually impaired.  42 U.S.C. §§ 12102(1)(A)–(C).  The IDOC argues that Stevens was

---

Plaintiff's motion but does so in no systematic fashion.  Defendant responded to Plaintiff's motion for summary judgment, but Plaintiff never did the same; neither party filed a reply, despite the Court's ample and explicit provision of time for these activities.  *See* Jan. 22, 2015 Text Order.  The Court thus largely evaluates the motions for summary judgment on their own merits, without benefit of the opposing side's full briefing, but will not scour the record looking for facts to controvert a well-supported point.  *See Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir. 1989) ("A district court need not scour the record to make the case of a party who does nothing."); *see also Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 991 (N.D. Ill. 2003) ("[T]he court is to evaluate each motion on its merits, resolving factual uncertainties and drawing all reasonable inferences against the movant.").

[7] Although for a retaliation claim, Stevens must show that he was engaged in a protected activity and suffered an adverse employment action, *Casna v. City of Loves Park*, 574 F.3d 420, 426 (7th Cir. 2009), and must show the latter for a discrimination claim, the parties appear to agree that he meets both of these requirements.  To wit, he made an ADA accommodation request to his employer, and was fired.

not actually impaired, but does not address whether Stevens had a record of qualifying

impairment, or was perceived by the IDOC to have been impaired.  Mem. Supp. Def.'s Mot.

Summ. J. 12–15.  In response, Stevens argues both that he was actually impaired at the time of

the adverse employment action, and that, furthermore, the IDOC perceived him as having an

impairment.  Mem. Supp. Pl.'s Mot. Summ. J. 15.  The two claims are plainly factually

intertwined, in that if Stevens was actually impaired at some point, it is more likely that he was

regarded as having been impaired.  *Cf. United States v. Medina*, 755 F.2d 1269, 1274 (7th Cir.

1985) ("Evidence is relevant if it has 'any tendency to make the existence of a fact that is of

consequence to the determination of the action more or less probable than it would be without

the evidence.'" (quoting Fed. R. Evid. 401)).  However, either claim's truth, as well as a record

of qualifying impairment (which would, of course, depend directly on whether Stevens had been

impaired at some point), would be sufficient in itself to render Stevens a qualifying individual.

Accordingly, the Court first analyzes the IDOC's claim that Stevens was never impaired, and

then discusses the sufficiency of the evidence Stevens offers to create an issue of material fact

under each of the methods of showing a disability provided by 42 U.S.C. §§ 12102(1)(A )–(C).

    There is no dispute that depression may sometimes qualify as an impairment under the

ADA, leading to a finding of disability.  *See* Mem. Supp. Def.'s Mot. Summ. J. 12; *Schneiker*,

200 F.3d at 1060 (stating that depression with intermittent manifestations in the form of

alcoholism could count as an actual impairment).  Some depression may substantially limit major

life activities and some may not, so it is important to look closely at the particular facts about an

individual's alleged depression in order to see whether it substantially limited one or more of his

major life activities.  *See Toyota Motor*, 534 U.S. at 199 ("An individualized assessment of the

effect of an impairment is particularly necessary when the impairment is one whose symptoms

14

vary widely from person to person."); *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719 (7th Cir. 1998) (noting that "the determination must be made 'on a case-by-case-basis'" (quoting *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir. 1995)), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). The IDOC argues that Stevens was not a qualifying individual at the times relevant to his claim because he has not shown that his depression "substantially limited his ability to perform a major life activity." Mem. Sup. Def.'s Mot. Summ. J. 13. The IDOC goes on to argue that because Plaintiff sought only to be transferred from under the direct supervision of Joni Harris, he has only demonstrated that he could not work under Harris in particular. *Id.* at 14. However, the evidence Stevens submitted suggests that, in early 2005, Stevens's depression hindered him from working and caring for himself, either of which would be sufficient to qualify him as disabled with the meaning of the ADA.

While Stevens had been hospitalized for depression before, he stated that he was in good health when he first transferred to Pontiac in 2004. Stevens Decl. ¶¶ 3–7. Sometime in the fall of 2004, Stevens's condition got worse, and he started seeing a psychiatrist and taking Wellbutrin and Zoloft, but this did not help. *Id.* ¶ 7. By early spring of 2005, he was suffering from the conditions that induced Dr. Amy Ray to recommend that he be placed on paid leave. *Id.* Stevens stated, of his own mental condition at the time, that it was a "tremendous struggle" for him even to get out of bed. Jan. 27, 2005 Stevens Letter 5, Mem. Supp. Def.'s Mot. Summ. J. Ex. D. After examining him on February 2, 2005, Dr. Amy Ray noted the Stevens "experienced suicidal ideation on a daily basis and had thought about overdosing with his current medication." Ray Report 1, Mem. Supp. Def.'s Mot. Summ. J. Ex. E. Stevens wept during this interview and told Ray that he found himself crying all day. *Id.* at 2. Ray concluded that

Stevens was experiencing "genuine psychiatric symptoms that require treatment," and that these symptoms were presently interfering with his ability to perform his duties as a correctional officer.  Later, on March 23, 2005, Stevens told Dr. Joseph Bohlen that he was crying less frequently, and that, although his concentration was "groggy in the morning," his attention was no longer distracted by extraneous factors.  Bohlen Report 3, Mem. Supp. Def.'s Mot. Summ. J. Ex. F.  Bohlen opined that only the proper medication would give him "relief from his depressive signs and symptoms," and that he would have to take it for the rest of his career or life.  *Id.*

Cumulatively, a jury could infer from this evidence that Stevens suffered, at some point, from acute depression—an intermittent manifestation of a physical or mental impairment that actually and substantially limited his ability to perform many major life activities including but not limited to working and learning.  *See Vande Zande v. Wisconsin Dep't of Admin.*, 44 F.3d 538, 543–44 (7th Cir. 1995) ((holding pressure ulcers, which were result of paralysis, were "intermittent impairment[s] that [are] a characteristic manifestation of an admitted disability" and therefore covered by the ADA).

The IDOC contends that Stevens was not "disabled by his depression," Mem. Supp. Def.'s Mot. Summ. J. 13, from performing major life activities such as "driving, reading, household chores, walking, speaking, and breathing," *id*, and that any disability in the major life activity of working that he suffered was limited to his inability to work subordinate to one particular supervisor, Harris, *id.*  However, Dr. Ray reported that Stevens's symptoms did interfere with his ability to perform his duties as a correctional officer, a report which Stevens and the IDOC seem to have accepted.  Working is a "major life activity," and a trier of fact could infer from Dr. Ray's opinion, Stevens's hospitalization, and the IDOC's refusal to allow him to return to work until being psychologically evaluated, that Stevens's ability to work had been

substantially limited.  Moreover, a trier of fact could determine that the unpleasant symptoms

Stevens identified—constant weeping, suicidal ideation, and diminished motivation to live—

interfered with caring for oneself or learning, other "major life activities" listed in the applicable

version of 29 C.F.R. § 1630.2(i)—or with other major life activities not listed there.[8]  Stevens

has created a genuine issue of material fact as to whether he had a physical or mental impairment

that substantially limited one or more of his major life activities.

It may be, however, as the IDOC argues, that Stevens's depression is treatable and he is

no longer substantially limited by the impairment, and thus not a qualifying individual with a

disability by reason of being currently impaired.  Mem. Supp. Def.'s Mot. Summ. J. 14–15.

Indeed, his continued and reportedly unblemished work record with the IDOC suggests as much.

However, Stevens need not currently be impaired in a major life activity to make out an ADA

claim, because he may also be a  "qualifying individual with a disability" either by having a

record of a substantially limiting impairment, or by having been perceived by his employer as

having such an impairment.  A trier of fact could find that Stevens is a qualifying person with a

disability by both these routes, as explained below.  Accordingly, there is not need to speculate

as to whether Stevens is now substantially impaired, or was at any particular time during the

events in question.

A trier of fact could find that Stevens had a record of impairment, even if he is not now

impaired.  "'Having a record of such impairment' means that the individual 'has a history of, or

has been misclassified as having, a mental or physical impairment that substantially limits one or

---

[8] 29 C.F.R. § 1630.2(i) states that "Major Life Activities means functions such as caring for oneself . . . ."  "Such as" implies that the list is non-exhaustive, which interpretation is consistent with the Supreme Court's treatment of the term in *Toyota Motor*.  There, the Court repeatedly discussed evaluative criteria for determining whether a life activity qualified as "major."  *See e.g. Toyota Motor*, 534 U.S. at 195, 197.  Such determinations would not be necessary if the Court had regarded as exhaustive either of the statutory lists of major life activities upon which it relied.

more major life activities.'" *Shepler v. Nw. Ohio Developmental Ctr.*, 205 F.3d 1341 (6th Cir.

2000) (quoting 29 C.F.R. § 1630.2(k)).  Stevens suffered from acute mental and emotional

distress in February and potentially March of 2005 (and possibly during his earlier

hospitalization).  Drs. Ray and Bohlen, both of whom wrote separate reports, documented his

condition in detail.  As explained above, a jury could find that that condition constituted an

impairment substantially limiting a major life activity.  Thus, a trier of fact could find that

Stephens had a record of such a condition.

Furthermore, Ray and Stevens gave their reports to the IDOC, which could permit a trier

of fact to find that the IDOC had knowledge of Stevens's condition, and thus regarded him as

having it.  Dr. Ray, who worked for the IDOC, wrote a report that was given to the IDOC

describing Stevens as suffering from "Major Depressive Disorder, Recurrent [and] R/O Bipolar

Disorder," and describing all of Stevens's symptoms.   The IDOC clearly accepted and acted on

the report in a way that could give rise to an inference that it regarded Stevens as unable to

perform the functions of his job.  *Cf. Kampmier v. Emeritus Corp.*, 472 F.3d 930, 938 (7th Cir.

2007) (finding that a plaintiff "has provided no evidence that [her employer] thought she was

unable to perform the functions of her job" and for that reason finding plaintiff had not

established that her employer regarded her as disabled).   Ray recommended that Stevens be

placed on paid leave immediately, hospitalized, and subjected to further psychiatric evaluation.

The IDOC received this report, and acted on it by referring Stevens for further psychiatric

evaluation.  *See Mattice v. Mem'l Hosp. of S. Bend, Inc.*, 249 F.3d 682, 684 (7th Cir. 2001)

(finding a doctor who alleged a history of having received care for panic disorder, severe

depression, and suicidal ideation stated a claim both for having a record of impairment and being

regarded by his employer as having such impairment).

In short, a jury could find by more than one method that Stevens was a qualifying person with a disability.  Insofar as the IDOC's motion seeks to argue otherwise, it fails.

**B. Causal Connection Between Stevens' Depression, Threatened ADA Claim, and the IDOC's Adverse Employment Actions**

Since Stevens proceeds by the direct method of proof, the Court must first determine whether he has sufficiently shown the causal connection between his firing and the IDOC's knowledge or notice of his disability/request for reasonable accommodation by direct evidence, circumstantial evidence, or both.  It is plain that Stevens does not proceed by direct evidence, for direct evidence "requires an admission by the decision maker that his or her actions were based on the prohibited animus."  *Dickerson*, 657 F.3d 601.  Such an admission does not appear in this case.

Of the kinds of circumstantial evidence a plaintiff may use to show a causal link, two—suspicious timing and evidence of a pretextual reason for the adverse employment action—are relevant here.  Thus, Stevens must create a convincing mosaic, made up of more than one piece of evidence, that points directly to the IDOC's prohibited animus as the reason for its adverse employment actions against him.  He is able to do so as to both his discrimination and retaliation claims, at least to the extent that a jury could find in his favor on those claims.

The initial piece of evidence Stevens presents, and the strongest, is the timing of the action the IDOC took against him.  The IDOC scheduled Stevens to return to work on April 20, 2005 following his initial period of administrative lockout.  The day before he was supposed to return, almost two months after his initial hospitalization and administrative lockout, the IDOC called him and told him not to return, and Stevens alleges that there was no explanation given at

the time.[9]  This was also the *day after* Stevens sent the IDOC a list of ADA requests for

reasonable accommodation.  The timing, as Stevens tells it, is doubly suspicious; the notice not

to come back came hot on the heels of his request for accommodation and on the eve of his

return date.  The timing is suggestive both of an immediate reaction to the ADA reasonable

accommodation claim and a last-minute effort to keep Stevens from returning to work—a

stalling maneuver taken, in the absence of a substantive reason (again, on Stevens's version of

events), to buy the IDOC more time to arrange a pretextual one.[10]  Thus, it points

circumstantially—at least at this point in the litigation—toward both a retaliatory and a

discriminatory motive for the action that the IDOC began to take against him on April 20, 2005

and continued for many months.  And the time period in question is a day on either side, a

narrow window indeed.  Time periods as long as a month between adverse employment actions

and their causes have been found sufficiently short to infer retaliatory motive.  *See Coleman v.*

*Donahoe*, 667 F.3d 835, 861–62 (7th Cir. 2012) ("Our cases reject any bright-line numeric rule,

but when there is corroborating evidence of retaliatory motive . . . an interval of a few weeks or

---

[9] *See* Def.'s Mem. Supp. Mot. Summ. J. 7 (stating "On or about April 19, 2005, IDOC advised Plaintiff he was being placed on administrative lockout beginning April 4, 2005 because he could not carry a firearm under Illinois law"); Stevens Decl. ¶ 18 (stating "The next day, I received a phone call from Elaine Rentz, a Human Resources representative at Pontiac.  She told me that I was back on Administrative Lockout.  She did not explain the basis of this decision to me."); Def.'s  Resp. Mot. Summ J. 3 (stating that it is "[d]isputed whether Plaintiff knew of the reason for the administrative lockout, but immaterial; whether Plaintiff was informed of the reason for the administrative lockout has no bearing on the outcome of the case.").  As explained below, whether or not the IDOC informed Stevens of the reason for the administrative lockout is highly material.  On Defendant's motion for summary judgment, the Court construes the facts in the light most favorable to Plaintiff, and will only grant summary judgment to Defendant if there are no disputed material facts and summary judgment is appropriate as a matter of law.  Fed. R. Civ. P. 56(a).  Additionally, the IDOC offers no support for its assertion in its response to Plaintiff's disputed material facts that it informed him on April 19 of the reasons for the lockout.

[10] The April 19 lockout is less suggestive of discriminatory motive than it is of retaliatory motive, but it is suggestive of the former nonetheless.  As discussed in more detail *infra*, the puzzlingly last-minute nature of the command not to return to work is consistent with a scenario in which the IDOC was seeking pretextual reasons to prevent Stevens's return and, not having found one, stalled him by telling him not to come back and continuing its search for a pretextual reason.  Otherwise, it is hard to understand why the IDOC would not have told Stevens not to come back earlier—and it is hard to see what plausible motive it could have had for telling him not to come back, since the purported reason only appeared some days later, in the form of an internal memorandum.

even months may provide probative evidence of the required causal nexus.").  "Deciding when
the inference is appropriate cannot be resolved by a legal rule; the answer depends on
context . . . .  A jury, not a judge, should decide whether the inference is appropriate."

*Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011).

The IDOC does not address this doubly suspicious timing in its briefing.  Rather, it
argues that a legitimate reason existed to prevent Stevens from returning to work, in the form of
his inability to possess a firearm under Illinois state law.  Mem. Supp. Def.'s Mot. Summ. J. 15.
Surprisingly, the IDOC offers no evidence about how this rule, previously unknown (on the
evidence before the Court) across the entire Illinois Department of Corrections, suddenly came to
its attention a short five days after it had told Stevens without explanation that he should not
come back to work.[11]  It is at the very least a great coincidence, if no discriminatory motive was
at play, that IDOC's director himself suddenly and, at least according to Stevens, without
explanation, issued a ukase changing departmental policy in such way as to provide a convenient
legal basis for keeping Stevens on administrative lockout and initiating an employee review
hearing.  The impression given is of an employer casting about for reasons to fire a disabled
employee and lighting upon a good one in the nick of time, an impression the IDOC does
nothing to dispel.

Furthermore, if, as Stevens alleges, the IDOC was less than transparent about why he was
placed back on administrative lockout on April 19, then it suggests that the eventually-stated
reason was pretextual.  Stevens offers evidence suggesting that he learned of the IDOC's

---

[11] Guy Pierce, Assistant Warden of Operations at Pontiac, states in his affidavit that the IDOC Director's April 25,
2005 memorandum  "reminded" the IDOC that it could not issue firearms to employees who had been inpatients at
mental hospitals.  Pierce Aff. ¶ 7.  However, the Director's memorandum  does not present itself as a "reminder,"
and, indeed, suggests that Department Rule 501 and AD 03.02.10 8 on Standards of Conduct will be revised to
reflect the contents of the memorandum.

gun/hospitalization policy not because the IDOC saw fit to tell him about it after putting him

back on administrative lockout for no stated reason, but because his brother, who was also a

correctional officer, received the notice as an IDOC employee.  Had the IDOC's reason

legitimately been that it wished to follow Illinois law, it could easily have informed Stevens of

the pending policy when it placed him on lockout.  If the IDOC indeed did not supply Stevens

with reasons on April 19, the lack of transparency suggests that the IDOC negotiated in bad faith,

with the aim of getting Stevens fired one way or another.[12]

    The IDOC now also attempts to frame the 720 ILCS 5/24-3.1 bar on Stevens's possession

of a firearm as a factor that prevented him from being a "qualifying person" under the ADA,

because no reasonable accommodation could be made for him.  Mem. Supp. Def.'s Mot. Summ.

J. 15.  However, the argument fails because, as facts bore out, there was a manifestly reasonable

accommodation that the IDOC could have offered—permitting Stevens to get a FOID card.[13]

The fact that even after he did so, it took many months and an arbitrator's order to get the IDOC

to accept this accommodation further suggests just how little the IDOC thought of the FOID card

---

[12] As explained *supra*, n.9, the parties contest whether Stevens was informed on April 19 for the reasons for the lockout.  Since the fact is disputed and material, the Court's discussion focuses on what a reasonable fact-finder could make of the dispute at trial—that is, given the dispute, whether a reasonable jury could find in Stevens's favor.

[13] The FOID implementing act provides that law enforcement officers who have had their FOID cards revoked for having been inpatients at mental institutions may under some circumstances appeal and have their firearms privileges reinstated, as in fact happened to Stevens:

  (1) An active law enforcement officer employed by a unit of government, who is denied, revoked, or has his or her Firearm Owner's Identification Card seized under subsection (e) of Section 8 of this Act may apply to the Director of State Police requesting relief if the officer did not act in a manner threatening to the officer, another person, or the public as determined by the treating clinical psychologist or physician, and as a result of his or her work is referred by the employer for or voluntarily seeks mental health evaluation or treatment by a licensed clinical psychologist, psychiatrist, or qualified examiner, and:

    (A) the officer has not received treatment involuntarily at a mental health facility, regardless of the length of admission; or has not been voluntarily admitted to a mental health facility for more than 30 days and not for more than one incident within the past 5 years; and

    (B)  the officer has not left the mental institution against medical advice.

430 Ill. Comp. Stat. Ann. 65/10(c-5).

as being a reasonable accommodation available in Stevens's case.  This evidence, as the Court must interpret it on summary judgment, suggests that the 720 ILCS 5/24-3.1 ban on mental ward inpatients carrying firearms was not a genuine reason to fire Stevens, but rather a pretextual one.

Further facts can be used to create a mosaic suggesting, at the least, that a jury could find a causal link between Steven's disability and ADA claim and the IDOC's actions against him. Many of the IDOC's actions give the impression of an employer committed not to the "interactive process" to find reasonable accommodation that the law requires, *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005), but rather to a bad-faith negotiation in which it concealed important facts from Stevens and sought to terminate him quickly, before he could remove the purported reason for his termination by acquiring a FOID card.  Stevens was formally suspended pending discharge on July 29, 2005 even though he had at that time applied for a FOID card and was waiting to hear back from the ISP.  After Stevens had been terminated and while he was grieving that termination, but before he had received his FOID card, the IDOC told him that if he had got a card, they would have re-hired him.  Stevens got a card; the IDOC refused to re-hire him.

The IDOC's remaining arguments on summary judgment do not address Stevens's discrimination claims, and focus only on his retaliation claims.  Each argument shares the flaw of assuming that any alleged retaliation must have comprised a discrete event in the bargaining process after the IDOC initiated its adverse employment action against Stevens, rather than the whole of that action itself, following Stevens' requests for reasonable accommodation under the ADA on April 18, 2005.  Thus, the IDOC's claims that there is no evidence Stevens was asked to dismiss his discrimination claims in exchange for being re-hired miss that mark.  While such a bargain might, *pace* the IDOC's legal argument to the contrary, constitute retaliation, the

broadest and most basic retaliatory act that Stevens' allegations imply is his firing itself, a process begun on April 19.

Taken together, these facts add up to a convincing mosaic. *See Coleman*, 667 F.3d at 861–62. They create genuine issues of material fact as to whether the IDOC discriminated against Stevens because of his disability and/or retaliated against him because he requested reasonable accommodation under the ADA.

**IV.    Stevens's Motion For Summary Judgment**

Stevens's brief motion for summary judgment rests solely on the ground that the IDOC's knowledge of Stevens's disability is "the only explanation for Defendant's failure to reinstate Mr. Stevens." On the contrary, there are many explanations for this continued reluctance, as well as for the IDOC's initial adverse employment action, including a concern for the safety of IDOC staff and inmates, and, prior to the issuance of Stevens's FOID card, a genuine desire to follow the law of Illinois. The evidence Stevens presents remains circumstantial, and still mostly boils down to the very suspicious timing of Stevens's April 19, 2005 administrative lockout and the IDOC's April 25, 2005 policy change, and its general intransigence in dealing with Stevens's claims.

Furthermore, Stevens's motion for summary judgment contains no explanation at all of how he can show a causal link between his disability and the IDOC's adverse employment action. It contains no explanation of how the facts he musters create an inference that the elements of either ADA violation are satisfied—elements Stevens never even bothers to recite. And it raises for the first time, in its closing breath, an argument that the IDOC failed to provide Stevens with reasonable accommodation. In short, it does nothing to show that there is no

genuine issue of material fact as to the ADA violations alleged.  Plaintiff's motion for summary judgment fails.

## CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment, ECF No. 23, is DENIED, and Plaintiff's Motion for Summary Judgment, ECF No. 28, is DENIED.  Since the hearings and jury trial date were vacated, Apr. 21, 2015 Text Order, the Court now resets them.  Final Pretrial Conference is set for December 10, 2015 at 10:00 a.m.  Jury Trial is set for 9:00 a.m. on January 25, 2016.

Entered this 28th day of September, 2015.

s/ Sara Darrow

_____
SARA DARROW
UNITED STATES DISTRICT JUDGE